862 F.Supp. 381

FEDERAL-MOGUL CORP., PLAINTIFF, AND TORRINGTON CO., PLAINTIFF-INTERVENOR *v.* UNITED STATES, DEFENDANT, AND SKF USA INC., SKF FRANCE S.A., SKF GMBH, SKF INDUSTRIE, S.P.A., SKF (U.K.) LTD. AND SKF SVERIGE, AB, FAG KUGELFISCHER GEORG SCHAFER KGAA, FAG CUSCINETTI S.P.A., FAG (UK) LTD., BARDEN CORP. (UK) LTD., FAG BEARINGS CORP., BARDEN CORP., BARDEN PRECISION BEARINGS CORP., RHP BEARINGS AND RHP BEARINGS INC., PEER BEARING CO., KOYO SEIKO CO., LTD., KOYO CORP. OF U.S.A., NSK LTD., NSK CORP., SNR ROULEMENTS, NTN BEARING CORP. OF AMERICA, AMERICAN NTN BEARING MANUFACTURING CORP., NTN CORP., AND NTN KUGELLAGERFABRIK (DEUTSCHLAND) GMBH, DEFENDANT-INTERVENORS

Consolidated Court No. 92–06–00422

786

(Dated August 26, 1994)

*Frederick L. Ikenson. P.C. (Frederick L. Ikenson, J. Eric Nissley, Joseph A. Perna, V* and *Larry Hampel)* for plaintiff, Federal-Mogul Corporation.

*Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, Wesley K. Caine* and *Robert A. Weaver)* for plaintiff-intervenor The Torrington Company.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Marc E. Montalbine);* of counsel: *Stephen J. Claeys, Craig R. Giesze, Dean A. Pinkert, Thomas H. Fine* and *Alicia Greenidge,* Attorney-Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

*Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Juliana M. Cofrancesco* and *Thomas J. Trendl)* for defendant-intervenors SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Limited and SKF Sverige, AB.

*Grunfeld, Desiderio, Lebowitz & Silverman (Max F. Schutzman, Andrew B. Schroth, David L. Simon* and *Matthew L. Pascocello)* for defendant-intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti SpA, FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation, The Barden Corporation and Barden Precision Bearings Corporation.

*Covington & Burling (Harvey M. Applebaum, David R. Grace* and *Thomas A. Robertson)* for defendant-intervenors RHP Bearings and RHP Bearings Inc.

*Venable, Baetjer, Howard & Civiletti (John M. Gurley* and *Lindsay B. Meyer)* for defendant-intervenor Peer Bearing Company.

*Powell, Goldstein, Frazer & Murphy (Peter O. Suchman, Neil R. Ellis, T. George Davis* and *Niall P. Meagher)* for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

*Coudert Brothers (Robert A. Lipstein, Matthew P. Jaffe, Nathan V. Holt, Grace W. Lawson* and *Alice E.M.. Aragones)* for defendant-intervenors NSK Ltd. and NSK Corporation.

*Grunfeld, Desiderio, Lebowitz & Silverman (Bruce M. Mitchell, David L. Simon, Philip S. Gallas, Jeffrey S. Grimson, Andrew B. Schroth* and *Matthew L. Pascocello)* for defendant-intervenor SNR Roulements.

*Barnes, Richardson & Colburn (Robert E. Burke, Donald J. Unger, Kazumune v. Kano* and *Diane A. MacDonald)* for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH.

## Opinion

Tsoucalas, *Judge:* Plaintiff, Federal-Mogul Corporation ("Federal-Mogul"), challenges certain aspects of the Department of Commerce, International Trade Administration's ("ITA") determination in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("Final Results"),* 57 Fed. Reg. 28,360 (1992). Amendments to the Final Results did not alter the results in any respect relevant to the issues discussed herein. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 32,969, (1992); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 59,080 (1992).

Numerous defendant-intervenors oppose plaintiff's challenge.

## Background

On June 28, July 19 and August 14, 1991, the ITA announced its initiation of administrative reviews of respondents' ball bearing, cylindrical roller bearing and spherical plain bearing imports. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed. Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed. Reg. 40,305 (1991).

On March 31, 1992, the ITA published its preliminary determinations in the second administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 57 Fed. Reg. 10,859 (1992); 57 Fed. Reg. 10,862 (1992) (Federal Republic of Germany); 57 Fed. Reg. 10,865 (1992) (Italy); 57 Fed. Reg. 10,868 (1992) (Japan); 57 Fed. Reg. 10,875 (1992) (Sweden); 57 Fed. Reg. 10,878 (1992) (United Kingdom).

On June 24, 1992, the ITA published the consolidated Final Results of nine administrative reviews. *Final Results,* 57 Fed. Reg. at 28,360.

Federal-Mogul now moves pursuant to Rule 56.1 of the Rules of this Court for partial judgment on the agency record. Plaintiff alleges that the following actions by the ITA, with respect to Germany, France, Italy, Japan, Sweden and the United Kingdom, were unsupported by substantial evidence on the administrative record and not in accordance with law: (1) the ITA's use of a methodology for adjusting United States price

("USP")[1] and foreign market value ("FMV")[2] for value added tax ("VAT") that (A) improperly allowed a USP adjustment and misapplied best information available ("BIA"), (B) incorrectly calculated tax base for U.S. sales, (C) failed to measure the tax incidence or "pass through" of tax to the home market consumer, (D) failed to impose a cap on the VAT adjustment to USP, and (E) granted a circumstance of sale ("COS") adjustment to FMV to achieve tax neutrality; (2) allowance of a COS adjustment for currency hedging expenses; (3) incorrect treatment of commissions on purchase price ("PP") transactions in the calculation of FMV; (4) incorrect calculation of cash deposit rates; (5) application of a new "all other" rate for cash deposits to unreviewed companies; (6) failure to remove home market commission expenses from sales price before making the sales price to cost of production ("COP") comparison in the calculation of FMV for SKF GmbH ("SKF-Germany"); (7) incorrect calculation of home market credit expenses for SKF Industrie, S.p.A. ("SKF-Italy"); (8) failure to correct a clerical error in FAG Cuscinetti S.p.A.'s ("FAG-Italy") reported financial expenses; (9) failure to add an amount for profit to the data FAG-Italy submitted in lieu of related-party transfer prices for purposes of constructed value ("CV") and COP analyses; (10) allowance of a COS adjustment to FMV for FAG-Italy for expenses incurred by FAG Kugelfischer Georg Schafer KGaA ("FAG-Germany"); (11) allowance of a direct COS adjustment to home market price for FAG-Italy's technical services and warranty expenses; (12) removal of home market packing costs from SNR's home market price in the calculation of FMV; (13) incorrect treatment of SKF Italy's warehouse expense; (14) allowance of a duty drawback adjustment to USP for SKF-Italy; (15) incorrect calculation of Meter, S.p.A.'s ("Meter") credit expenses; and (16) allowance of an adjustment to USP for FAG-Italy, FAG (UK) Limited ("FAG-UK") and FAG-Germany for freight expenses reimbursed. *Federal-Mogul Corporation's First Motion for Partial Judgment Upon the Agency Record* at 10–124 ("Plaintiff's Brief").

## DISCUSSION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

This Court must uphold the ITA's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quan-

---

[1] Purchase price and exporter's sales price ("ESP") are the two types of United States price. USP, purchase price and ESP are defined at 19 U.S.C. § 1677a (1988).

[2] FMV is defined at 19 U.S.C. § 1677b(a) (1988).

tity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed. Cir. 1990).

### 1. *Treatment of Value Added Tax:*

Adjustments to USP for consumption taxes forgiven on merchandise which is exported to the United States are governed by 19 U.S.C. § 1677a(d)(1)(C) (1988) which states:

> **(d) Adjustments to purchase price and exporter's sales price**
> The purchase price and the exporter's sales price shall be adjusted by being—
> (1) increased by—
>
> \*      \*      \*      \*      \*      \*      \*
>
> (C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; \* \* \*

### A. *USP Adjustment and Use of Best Information Available:*

Federal-Mogul first argues that the ITA unlawfully granted respondents an adjustment to USP for tax forgiven on exported anti-friction bearings. Plaintiff claims that the ITA did not know the amount of tax collected on respondents' home market sales, the amount of tax passed through to their home market consumers, or the amount of tax forgiven on their exports. *Plaintiff's Brief* at 11–12. Plaintiff argues that, as respondents' reported home market sales were net of VAT, the ITA could not determine the value on which taxes were based on home market sales and, consequently, did not know the value against which tax was forgiven on export sales. *Id.* at 12. In addition, Federal-Mogul asserts that the ITA erred in applying nonadverse BIA to grant respondents the maximum lawful upward adjustment to USP, insofar as respondents failed to provide required VAT information. *Id.* at 12–16.

In the Final Results, the ITA stated, "[W]e are satisfied that the record shows that the taxes were charged and paid on home market sales. Therefore, the respondents are entitled to the adjustment to U.S. price." *Final Results,* 57 Fed. Reg. at 28,420. The ITA argues that respondents provided information on their country's tax laws, described the taxes levied upon home market sales, stated the amount of those taxes, described how taxes were calculated and showed that export sales were exempt from those taxes. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Judgement Upon the*

*Agency Record ("Defendant's Brief")* at 11. The ITA explained its methodology for adjusting USP as follows:

> We calculated the addition to USP by applying the HM [home market] tax rate to the net USP after all other adjustments were made. This imputed tax amount is BIA, because HM sales were reported net of VAT, and we are thus unable to determine what the home market tax base was.

*Final Results,* 57 Fed. Reg. at 28,420.

The ITA argues that, since each country's tax base was the invoice price but invoice prices ranged from ex-factory prices to prices which included transportation, insurance and other expenses, it employed a USP net of all other adjustments—a price "analogous to an ex-factory price." *Defendant's Brief* at 13–15. The ITA contends that it did not impermissibly favor respondents as they supported their entitlement to a USP adjustment and the ITA used the smallest possible basis to calculate their USP tax adjustment, thereby increasing respondents' cash deposit rates. *Id.* at 14–15.

Defendant-intervenors, SKF USA Inc., SKF France, S.A., SKF GmbH, SKF Industrie, S.p.A., SKF (U.K.) Limited, SKF Sverige, AB ("SKF"), RHP Bearings, RHP Bearings Inc. ("RHP"), Koyo Seiko Co., Ltd., Koyo Corporation of U.S.A. ("Koyo"), NSK Ltd. and NSK Corporation ("NSK") argue that in situations such as here, where home market prices are invoiced exclusive of tax, the provisions of 19 U.S.C. § 1677a(d)(1)(C) do not apply and an adjustment need not be made to USP. *Opposition of SKF USA Inc., SKF Industrie, S.p.A., SKF (U.K.) Limited, SKF Sverige AB, SKF France, S.A., and SKF GmbH to Federal-Mogul's Motion for Judgment on the Agency Record ("SKF's Brief")* at 5–7; *Opposition of Defendant-Intervenors to Plaintiff's Motion for Judgment on the Agency Record ("RHP's Brief")* at 4–5; *Defendant-Intervenors' Memorandum in Opposition to Plaintiff's Motion for Partial Judgment Upon the Agency Record ("Koyo's Brief")* at 13, n.6; *NSK's Response Memorandum in Opposition to Federal-Mogul's Partial Motion for Judgment on the Agency Record ("NSK's Brief")* at 8–10.

The plain language of the statute requires that USP be increased by the amount of any indirect tax imposed on sales of the subject merchandise in the home market, regardless of whether FMV is reported net tax or not. *Zenith Elecs. Corp. v. United States,* 10 CIT 268, 275–82, 633 F. Supp. 1382, 1388–94 (1986), *appeal dismissed,* 875 F.2d 291 (Fed. Cir. 1989). Although respondents reported home market sales net of VAT, respondents' tax authorities tax home market sales and exempt exports from such taxes. Therefore, an adjustment to USP for tax forgiven on exports is required by the statute. This Court has previously affirmed the methodology that the ITA used in this case to adjust USP in its discussion of the tax base issue with respect to each of the six countries herein involved. *Federal-Mogul Corp. v. United States,* 17 CIT 525, 527–28, 824 F. Supp. 230, 233 (1993) (Germany); *Federal-Mogul Corp. v. United States,* 17 CIT 508, 510–11, 824 F. Supp. 223, 226 (1993)

(France); *Federal-Mogul Corp. v. United States,* 17 CIT 827 F. Supp. 767, 770 (1993) (Italy); *Federal-Mogul Corp. v. United States,* 17 CIT 88, 100, 813 F. Supp. 856, 866 (1993) (Japan); *Federal-Mogul Corp. v. United States,* 17 CIT 490, 824 F. Supp. 1082, 1085 (1993) (Sweden); *Federal-Mogul Corp. v. United States,* 17 CIT 479, 481, 824 F. Supp. 215, 218 (1993) (United Kingdom).

The record reveals the tax rate applicable to respondents' home market sales. The ITA applied the foreign market tax rate to a USP calculated at an appropriate point in the chain of commerce. Therefore, the Court finds that the ITA appropriately determined that USP adjustments were warranted for taxes forgiven on respondents' exports.

Federal-Mogul also asserts that the ITA's application of BIA was impermissibly favorable to respondents. The BIA implementing regulation allows the ITA to consider the cooperativeness of parties in determining what constitutes BIA. 19 C.F.R. § 353.37(b) (1992).[3] The ITA explained its BIA policy as follows:

> [W]e applied the following two tiers of BIA in situations where we were unable to use a company's response for purposes of determining that company's dumping margin:
>
> 1. When a company refused to cooperate with the Department or otherwise significantly impeded these proceedings, we used as BIA the higher of (1) the highest of the rates found for any firm for the same class or kind of merchandise in the same country of origin in the less than fair value investigation or prior administrative reviews; or (2) the highest rate found in this review for any firm for the same class or kind of merchandise in the same country of origin.
>
> 2. When a company substantially cooperated with our requests for information including, in some cases, verification, but failed to provide the information requested in a timely manner or in the form required, we used as BIA the higher of (1) the highest rate (including the "all others" rate) ever applicable to the firm for the same class or kind of merchandise from either the LTFV investigation or a prior administrative review; or (2) the highest calculated rate in this review for the class or kind of merchandise for any firm from the same country of origin.

*Final Results,* 57 Fed. Reg. at 28,379.

The United States Court of Appeals ("CAFC") has upheld the ITA's two-tier BIA policy, describing it as "a reasonable and permissible exercise of the ITA's statutory authority." *Allied-Signal Aerospace Co. v. United States,* 996 F.2d 1185, 1192 (Fed. Cir. 1993)

The ITA is in the best position to know what information it requires and what information will satisfy those requirements. Here, the ITA applied BIA in the manner articulated in its BIA policy as it deemed appropriate in light of the sufficiency of the information it received from respondents. The Court cannot dispute the ITA's application of BIA by characterizing respondents as uncooperative, thereby justifying a more

---

[3] *See* 19 U.S.C. § 1677e(c) (1988).

stringent BIA than that which the ITA deemed appropriate and applied. Accordingly, the Court finds that the ITA properly applied BIA in the calculation of respondents' USP adjustments.

## B. *Tax Base:*

Federal-Mogul also argues that, in adjusting USP for VAT forgiven on exports, the ITA applied the VAT rate to a tax base that was excessive in that it included profit and duty drawback. *Plaintiff's Brief* at 16–17.

In treating the tax base, the ITA

> calculated the addition to USP by applying the HM tax rate to the net USP after all other adjustments were made. This imputed tax amount is BIA, because HM sales were reported net of VAT, and we are thus unable to determine what the home market tax base was.

*Final Results,* 57 Fed. Reg. at 28,420.

Defendant explains that, in calculating the tax base, it evaluates the home market price and then uses, as the tax base for export sales, the price at the most comparable point in the chain of commerce for such sales. The ITA explains that, since here the home market price was a final sales price, it used a final sales price to calculate U.S. sales tax. *Defendant's Brief* at 17.

Federal-Mogul fails to cite statutory or other support for the position that profit should be excluded from the tax base. It is well established that profit is correctly a part of the calculation of USP. *Timken Co. v. United States,* 11 CIT 786, 811–14, 673 F. Supp. 495, 518–21 (1987). It makes sense that the tax base will include the manufacturer's profit regardless of whether the tax base is an ex-factory price, a retail or wholesale price, or some other price along the chain of commerce. This Court has held that the ITA's use of the net USP including profit as the tax base is reasonable and in accordance with law. *Federal-Mogul Corp.,* 17 CIT at 99-100, 813 F. Supp. at 866. This Court adheres to that position. Federal-Mogul is correct in its assertion that duty drawback is not a part of the price of exported merchandise and, therefore, may not be included in any calculation of tax base for forgiven taxes. However, plaintiff has not presented a scintilla of evidence demonstrating that the ITA included duty drawback in its calculation of respondents' tax base. Therefore, the Court sustains the ITA's use of the net USP including profit.

## C. *Tax Incidence*

Federal-Mogul also argues that the ITA erroneously adjusted USP for VAT forgiven on respondents' exports without measuring the amount of tax passed through to home market consumers. *Plaintiff's Brief* at 17–18. Federal-Mogul contends that the phrase in 19 U.S.C. § 1677a(d)(1)(C), which reads "but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation," requires the measurements. *Id.* at 18.

In the Final Results, the ITA stated:

> [W]e have not attempted to measure the amount of tax incidence in the home market. We do not agree that the statutory language, limiting the amount of adjustment to the amount of consumption tax "added to or included in the price" of bearings sold in the home market, requires the Department to measure the home market tax incidence.

*Final Results,* 57 Fed. Reg. at 28,420.

Koyo, NSK, and SKF argue that the plain language of the statute contains no hint that Congress sought to require the ITA to measure the amount of tax passed through to home market consumers. *SKF's Brief* at 11; *Koyo's Brief* at 41; *NSK's Brief* at 18.

This issue was resolved by the CAFC in *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511 (1993), *cert. denied sub nom., Int'l Union of Elec., Elec., Technical, Salaried and Mach. Workers, AFL-CIO,* 114 S. Ct. 2672 (1994). The court in *Daewoo* held that the ITA is not required to conduct a tax incidence analysis in order to adjust USP to account for the home market VAT. *Id.* at 1518–19. *See also Federal-Mogul Corp.,* 17 CIT at 94–95, 813 F. Supp. at 862–63. The CAFC upheld the ITA's interpretation of the language, "only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation," in 19 U.S.C. § 1677a(d)(1)(C) as requiring only an examination of exporters' customary business records. The CAFC found that

> [i]f an exporter's records show that a tax was either a separate "add on" to the domestic price or, although not separately stated, was, in fact, included in the price and that the taxes were paid to the government, that satisfies the tax inquiry required by the statute for an adjustment of the USP.

*Daewoo Elecs. Co.,* 6 F.3d at 1516–17.

In the case at bar, the record shows that the ITA has met the CAFC's standard with respect to all of the defendant-intervenors herein involved. Therefore, in accordance with this Court's prior decision and the *Daewoo* decision, the Court finds that the ITA's determination that 19 U.S.C. § 1677a(d)(1)(C) does not require the ITA to conduct an analysis of tax incidence in defendant-intervenors' antifriction bearing markets is reasonable and supported by law.

D. *Cap on VAT Adjustment to USP:*

Federal-Mogul next argues that, even assuming full pass through of home market tax, the monetary amount added to USP should be capped by the actual amount of tax paid in the home market. *Plaintiff's Brief* at 21–22.

The ITA essentially agrees that the addition to USP should be capped by the absolute amount of tax collected on home market sales but believes that the proper vehicle for accomplishing such a "cap" is through the COS adjustment to FMV. *Defendant's Brief* at 31.

The Court resolved this issue in *Federal-Mogul Corp.,* 17 CIT at 93, 813 F. Supp. at 860–63. The statute requires the ITA to "cap" the amount of the adjustment to USP by the actual amount of tax paid on sales in the home market. Therefore, the Court orders the ITA to examine the administrative record to determine the exact monetary amount of VAT paid on each sale in the home market and to assure that the amount added to the comparable USP sale is less than or equal to this amount. In this case, the amounts paid in the home market as VAT were maintained in separate accounts in respondents' company books and records. This documentation represents evidence that these were the amounts actually paid as VAT on home market sales. The ITA is instructed to examine the administrative record to determine if any other evidence contradicts this. If none is found, the ITA is instructed to use the amount of VAT paid on each home market sale as supported by the VAT account records as a "cap" on the amount of the adjustment made to the comparable USP sale pursuant to 19 U.S.C. § 1677a(d)(1)(C). If the administrative record supports the use of some other amount as the "cap," the ITA is instructed to use that other amount.

E. *Circumstance of Sale Adjustment to FMV:*

Plaintiff's last VAT argument is that the ITA acted without authority when it granted respondents a COS adjustment to FMV. *Plaintiff's Brief* at 22.

The ITA claims that the "multiplier effect" distorted respondents' dumping margins. *Defendant's Brief* at 20. The ITA attempted to achieve tax neutrality by eliminating the absolute difference between the VAT amount paid on respondents' home market sales and the addition for the VAT made to the comparable U.S. sales price by making a circumstance of sale adjustment to FMV pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988).[4] The ITA explained its methodology in the Final Results as follows:

> Because all HM sales were reported net of VAT, we added the same VAT amount to FMV as that calculated for USP. This is equivalent to calculating the actual HM tax and then performing a COS adjustment to FMV to eliminate the absolute difference between the amount of tax in each market * * *. [W]e are relying on the Department's broad statutory authority to make adjustments for such differences in the circumstances of sale.

*Final Results,* 57 Fed. Reg. at 28,419.

The ITA contends that 19 U.S.C. § 1677b(a)(4)(B) gives it broad authority to grant COS adjustments and that "differences in taxation are no different than any other difference in expenses between the two markets." *Defendant's Brief* at 22–23.

FAG Kugelfischer Georg Schafer KGaA, FAG Cuscinetti SpA, FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and Barden Precision Bearings Corporation ("FAG") and Koyo

---

[4] *See also* 19 C.F.R. § 353.56 (1992).

essentially agree with the ITA. *See Memorandum of Defendant-Intervenors FAG Kugelfischer Georg Schafer KGaA FAG Cuscinetti SpA, FAG (UK) Limited, Barden Corporation (UK) Limited, FAG Bearings Corporation and Barden Precision Bearings Corporation in Opposition to Plaintiff's First Motion for Partial Judgment Upon the Agency Record ("FAG's Brief")* at 19–20; *Koyo's Brief* at 36–37.

Federal-Mogul argues that the antidumping law does not intend or permit adjustments for commodity taxes to achieve tax neutrality. In support, Federal-Mogul cites to the extensive legislative history of the original Antidumping Act of 1921 and its subsequent amendments. *Plaintiff's Brief* at 24–28.

The Court finds that the ITA improperly adjusted FMV for respondents' commodity taxes. *See Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1580–82 (Fed. Cir. 1993); *see also Federal-Mogul-Corp.,* 17 CIT at 98–99, 813 F. Supp at 863–65. In *Zenith,* the CAFC held that 19 U.S.C. § 1677a(d)(1)(C) "does not provide for any adjustments to FMV to correct for tax-related distortion of the dumping margin." *Zenith,* 988 F.2d at 1580. The CAFC held that title 19 permits tax adjustments only to USP. *Id.* Further, the court stated that the legislative history of § 1677a(d)(1)(C) "does not suggest that Congress sought tax neutrality when it fashioned the adjustment provision." *Id.* at 1582. Accordingly, pursuant to *Zenith* and this Court's prior decisions, the Court holds that the ITA may not use a circumstance of sale adjustment to compute commodity tax adjustments in accord with § 1677a(d)(1)(C) rather than § 1677b(a)(4)(B).

The antidumping statute clearly contemplates a comparison between a FMV value which includes the VAT and an adjustment to USP in the amount of any taxes which have been forgiven pursuant to 19 U.S.C. § 1677a(d)(1)(C). However, in situations such as here where FMV has been reported net of VAT, the ITA must determine the correct VAT amount to be added to FMV based on the verified record before it. Where the record shows that the full VAT amount was paid on a home market sale, the ITA is required to add the full VAT amount for that sale to the FMV without any adjustments. Where the record shows that the VAT rate varies or where the manufacturer did not pay the full VAT amount, the ITA is required to add only the amount of tax actually paid on each home market sale to FMV. Hence, this Court remands this case to the ITA to allow the ITA to add the full amount of VAT actually paid on home market sales to FMV without adjustment.

## 2. *Currency Hedging Expenses:*

The ITA granted FAG-Germany, FAG-Italy and RHP adjustments to FMV for gains or losses attributed to currency hedging. *Plaintiff's Brief* at 49. In the Final Results, the ITA stated:

> In the first review, the Department found that if a respondent "clearly demonstrated * * * that, through the use of forward markets, it received different amounts for its U.S. sales than our cal-

culations would normally indicate, it is appropriate for the Department to take this action into account," because "[f]orward markets are clearly a tool that businesses can use to insure the actual return they receive on their sales." Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Administrative Review, 56 FR 31726 (July 11, 1991). The Department also ruled that "[t]o demonstrate that hedging has affected the actual exchange rate that it has received for its sales, a respondent must show * * * the actual exchange rate contracts that it entered into and demonstrate that these contracts are tied directly to the sales made during the period of review." *Ibid.* Accordingly, in these reviews, the Department made adjustments for hedging gains and losses where respondents have shown that these gains and losses are tied directly to sales of covered merchandise during the second review period.

*Final Results,* 57 Fed. Reg. at 28,413.

Federal-Mogul challenges adjustments to USP for the gains and losses respondents realized on currency hedging. plaintiff argues that hedging affects currency transactions between the respondents and financial institutions, but has no effect upon "the price at which merchandise is purchased, or agreed to be purchased" in purchase price transactions, or "the price at which merchandise is sold or agreed to be sold" in exporter's sales price transactions.[5] *Plaintiff's Brief* at 51. Federal-Mogul also argues that 19 U.S.C. § 1677a(d), (e) (1988) specifies the adjustments that can be made to USP and these provisions make no allowance for adjustment for currency hedging expenses. *Id.* at 51–52.

The ITA argues that it is granted broad discretion in determining when "differences in circumstances of sale" exist. Defendant states that the question of whether an adjustment for currency hedging should be made has arisen in several cases before this court. Defendant argues that decisions which have addressed this topic have never challenged the ITA's authority to make an adjustment to FMV for currency hedging, but have instead focused on whether the party claiming the adjustment has established a sufficiently direct relationship between the hedging activities and the sales under review. *Defendant's Brief* at 46. Defendant further argues that the goal of the antidumping law is to make fair comparisons and this cannot occur without accounting for currency hedging. *Defendant's Brief* at 47.

FAG argues that the purpose of an administrative review is to determine the difference between the level of profit realized by a firm on sales in the U.S. and its sales in the home market or in a third country. FAG claims that the ITA must compare a producer's return on U.S. sales to its return on home market or third country sales. If a producer realizes a return which is affected by its currency hedging activities, FAG argues that these effects should be accounted for. FAG compares an adjustment

---

[5] *See* 19 U.S.C. § 1677a(b), (c) (1988).

for currency hedging expenses to adjustments made for price discounts and rebates which, it claims, are well-recognized as adjustments made directly to price or as COS adjustments. FAG argues that currency hedging expenses, like discounts and rebates, affect the price received by the foreign producer. *FAG's Brief* at 34–36.

This Court rejected similar arguments in *Torrington Co. v. United States,* 17 CIT 922, 936–39, 832 F. Supp. 379, 390–93 (1993). Profits or losses generated through currency hedging activities relating to transfer of funds generated in the U.S. have nothing directly to do with the price paid for respondents' merchandise in the U.S. market. Gains and losses resulting from currency hedging are part of the indirect expenses of a company doing business in the U.S. market and should be treated as such pursuant to 19 C.F.R. § 353.56(b)(2) (1992).

Therefore, this Court finds that the ITA's treatment of currency hedging expenses as direct expenses subject to a COS adjustment to FMV is not in accordance with law. This issue is remanded to the ITA with instructions to treat these hedging expenses as indirect selling expenses.

### 3. *Commissions on Purchase Price Transactions:*

Federal-Mogul asserts that the ITA incorrectly calculated FMV with respect to respondents' purchase price transactions. *Plaintiff's Brief* at 39. Plaintiff argues that the ITA should add to FMV the indirectly related selling expenses incurred in the home market that relate to purchase price export transactions on which commissions were removed. *Id.* at 39–42. Essentially, plaintiff wants the ITA to reduce the amount of indirect selling expenses incurred on home market sales by the amount of indirect selling expenses incurred on home market sales with respect to purchase price transactions before making the commission offset adjustment to FMV. *Id.* at 42.

The ITA argues that, even assuming that the expenses at issue are U.S. indirect selling expenses, Federal-Mogul does not point to any authority which would allow deduction of these expenses from home market indirect selling expenses prior to the adjustment of FMV for U.S. commissions pursuant to § 353.56(b)(1). 19 C.F.R. §353.56(b)(1) (1992). *Defendant's Brief* at 39. The ITA made this argument in the Final Results, stating, "We are only authorized to offset commissions paid in one market with indirect selling expenses from the other market in cases in which no commissions are paid in the other market." *Final Results,* 57 Fed. Reg. at 28,407.

The Court is unpersuaded by plaintiff's argument. Federal-Mogul has established no statutory authority for the adjustment it proposes. Moreover, Federal-Mogul's proposal ignores the fact that the statute and regulations distinguish between purchase price and ESP sales in regard to permissible price adjustments. 19 U.S.C. § 1677a (1988); *see also Smith-Corona Group Consumer Prod. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1577–79 (Fed. Cir. 1983), *cert. denied,* 465 U.S. 1022 (1984)

(affirming ESP commission offsets premised on the statutory difference between ESP and purchase price transactions). The antidumping statute provides a basis for the removal of indirect selling expenses from USP with respect to ESP. 19 U.S.C. § 1677a(e)(2) (1988). There is no corollary statutory provision permitting removal of indirect selling expenses with respect to purchase price transactions.

In this case, sales commissions were paid on U.S. sales but were not paid on home market sales. Commission adjustments are governed by 19 C.F.R. § 353.56(b) (1992). This regulation sets out a "special rule" which allows an adjustment to FMV when commissions are paid on sales in the United States, but no commissions are paid on sales in the home market. 19 C.F.R. § 353.56(b)(1). Under such circumstances, the ITA will make an adjustment to FMV for home market indirect selling expenses up to the level of the commission expense removed from USP. Nowhere within the language of §353.56(b)(1) is there any support for an adjustment of the type that Federal-Mogul seeks. Subsection (b)(2) of this regulation concerns the Secretary's power to deduct indirect selling expenses from FMV only in ESP situations. 19 C.F.R. § 353.56(b)(2) (1992).

The Court finds that the ITA was bound by § 353.56(b)(1) in adjusting for U.S. commissions. As the ITA's adjustment for sales commissions pursuant to 19 C.F.R. § 353.56(b)(1) was reasonable and in accordance with law, the Court affirms said adjustment to FMV for U.S. sales commissions.

### 4. Calculation of Cash Deposit Rates:

In this review, the ITA used two different methodologies for the assessment of antidumping duties and for the establishment of future cash deposit rates. Defendant's Brief at 50. To calculate the assessment rate for ESP sales, the ITA "divided the total PUDD (potential uncollected dumping duties—calculated as the amount by which FMV exceeded USP) for the reviewed sales by the total entered value of those sales." Id. (emphasis added). To calculate the estimated cash deposit rate for ESP sales, the ITA "divided each exporter's PUDD by the total net U.S. price for that exporter's sales * * *." Id. (emphasis added).

Federal-Mogul contends that since the cash deposit rate is applied to the entered value of future entries, the ITA's policy of calculating this rate as a percentage of statutory USP rather than as a percentage of the entered value results in an under collection of cash deposits on future entries. Plaintiff's Brief at 53–54. Plaintiff asserts that calculating each respondent's cash deposit rate as a percentage of the respondent's total entered value for the period reviewed would avoid this result. Id. at 53. Plaintiff contests the use of a methodology which results in an estimated cash deposit rate that is different from the assessment duty rate, arguing that the estimated cash deposit should equal the amount of antidumping duty found to be due on the most recently reviewed entries. Id. at 53–59. Additionally, Federal-Mogul asserts that cash deposit rates

must be "as closely tailored to actual antidumping duties as is reasonable given data available * * *." *Id.* at 57 (*quoting Badger-Powhatan, Div. of Figgie Int'l, Inc. v. United States,* 10 CIT 241, 250, 633 F. Supp. 1364, 1373, *appeal dismissed,* 808 F.2d 823 (Fed. Cir. 1986)).

Koyo argues that the ITA is not required to use an identical methodology for computing cash deposits and assessment rates. *Koyo's Brief* at 54.

Federal-Mogul has said nothing which would cause the Court to change the position it has taken previously with respect to calculation of cash deposit rates. The Court adheres to its decision on this issue as expressed in *Federal-Mogul Corp.,* 17 CIT at 100, 105, 813 F. Supp. at 866–68, and finds that the methodology used by the ITA in this review was reasonable and in accordance with law. *See also Zenith Elecs. Corp. v. United States,* 15 CIT 394, 401–02, 770 F. Supp. 648, 655 (1991); *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 283, 712 F. Supp. 931, 957 (1989), *modified,* 6 F.3d 1511 (Fed. Cir. 1993), *cert. denied sub nom., Int'l Union of Elec., Elec., Technical, Salaried and Mach. Workers, AFL-CIO,* 114 S. Ct. 2672 (1994).

### 5. *"All Other" Rate:*

In this administrative review, for manufacturers and exporters who were not covered in this review, a prior review, or in the original less-than-fair-value ("LTFV") investigation, and who had therefore received the LTFV "all other" cash deposit rate, the ITA used the new "all other" rate calculated in this administrative review as the new cash deposit rate. *Final Results,* 57 Fed. Reg. at 28,362. In the Final Results, the ITA stated:

> [T]he following deposit requirements will be effective upon publication of this notice of final results of administrative review for all shipments of anti friction bearings (other than tapered roller bearings) and parts thereof, entered, or withdrawn from warehouse, for consumption on or after the date of publication, as provided by section 751(a)(1) of the Tariff Act:
>
> \*         \*         \*         \*         \*         \*         \*
>
> (4) The cash deposit rate for all other manufacturers or exporters will be the "all other" rate established in the final results of these administrative reviews.

*Id.,* 57 Fed. Reg. at 28,361–62.

Federal-Mogul argues that the ITA's use of the "all other" rate calculated during this administrative review as a new cash deposit rate for these unreviewed respondents is unlawful in that it is not in accordance with 19 U.S.C. § 1675(a)(2) and 19 C.F.R. § 353.22(e). *Plaintiff's Brief* at

59–67.[6] Essentially, Federal-Mogul asserts that the statute and the regulation require that when a respondent subject to an antidumping duty cash deposit rate is not reviewed, the rate at which that respondent has previously made cash deposits automatically becomes the respondent's assessment rate. plaintiff contends that this assessment rate remains the respondent's cash deposit rate for future entries. *Id.* at 60–62. Federal-Mogul points out that the ITA's own explanation of 19 C.F.R. § 353.22(e) states:

> Because the cash deposit (or bond) rate is the basis for each interested party's decision whether to exercise its right to request a review, it would make no sense to change the rate after the time for request has expired. * * * *In any event, the failure of an interested party to file a timely request for review constitutes a determination under section 751 of the dumping margin for the entries made during the review period.*

*Antidumping Duties; Final Rule,* 54 Fed. Reg. 12,742, 12,756 (1989) (emphasis added); *Plaintiff's Brief* at 61–62.

In addition, Federal-Mogul argues that the ITA's use of the new "all other" rate is contra to the reasoning articulated by Congress when it amended the antidumping duty statute in 1984 to make administrative reviews conditional upon a request by an interested party. *See* H.R. Conf. Rep. No. 1156, 98th Cong., 2d Sess. 181 (1984). *Plaintiff's Brief* at 63. Federal-Mogul argues that changing a respondent's cash deposit rate without reviewing that respondent's actual entries forces domestic interested parties to request reviews in order to prevent unreviewed respondents from receiving potentially incorrect and lower cash deposit rates. *Id.*

Federal-Mogul further argues that, in this matter, the ITA has departed from its longstanding administrative practice without providing an explanation for its departure. *Id.* at 64. Federal-Mogul points out that while the ITA claims to have implemented its new practice in *Notice of Final Results of Antidumping Duty Administrative Review: Certain Fresh Cut Flowers From Mexico ("Flowers"),* 56 Fed. Reg. 29,621, 29,623 (1991), the ITA continued to use the pre-existing cash deposit rate for unreviewed companies in *Color Television Receivers. Except for Video Monitors, From Taiwan; Final Results of Antidumping Duty Administrative Review,* 56 Fed. Reg. 31,378, 31,387 (1991), which was published after *Flowers* and before the Final Results challenged here. *Id.* at 65 n.123.

---

[6] 19 U.S.C. § 1675 (a)(2) (1988) states in pertinent part that the ITA's determination of antidumping duties made during an administrative review "shall be the basis * * * for deposits of estimated duties."

19 C.F.R. § 353.22(e) (1992) states:

(e) Automatic assessment of duty. (1) For orders, if the Secretary does not receive a timely request [for review], the Secretary, without additional notice, will instruct the Customs Service to assess antidumping duties on the merchandise described in paragraph (b) of this section at rates equal to the cash deposit of, or bond for, estimated antidumping duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption *and to continue to collect the cash deposits previously ordered.*

(2) If the Secretary receives a timely request [for review], the Secretary in accordance with paragraph (e)(1) of this section will instruct the Customs Service to assess antidumping duties, *and to continue to collect the cash deposits,* on the merchandise not covered by the request.

(Emphasis added.)

The ITA argues that 19 U.S.C. § 1675 (a) says nothing about how it is to calculate cash deposit rates for unreviewed companies. 19 U.S.C. § 1675(a); *Defendant's Brief* at 55. Defendant asserts that 19 U.S.C. § 1675(a)(2) does not apply to entries which are not covered by a request for administrative review. *Id.* Defendant admits that 19 C.F.R. § 353.22(e) provides for the automatic assessment of antidumping duties for unreviewed companies at their cash deposit rate but argues that it applies only to entries of companies which are subject to a specific cash deposit rate and not to entries subject to the "all other" rate. Defendant states that it has a separate administrative practice governing such entries. Further, defendant argues that since 19 C.F.R. § 353.22(e) does not apply to entries covered by the "all other" rate, the ITA is free to alter its administrative practice in regard to those entries. *Id.* at 55–58. The ITA states that it has explained its change of practice on this issue in numerous proceedings. *Id.* at 53. Additionally, defendant emphasizes that the "new 'all other' rate is only *prospectively* applied to entries made after the date of publication of the final results." *Id.* at 59.

In support of its position, the ITA relies on *Floral Trade Council v. United States*, 16 CIT 654, 656, 799 F. Supp. 116, 119 (1992), where the court raised, *sua sponte*, the issue of whether 19 C.F.R. § 353.22(e)(2) prohibits the ITA from using the new "all other" rate for old participants not covered by the current administrative review. Defendant argues that the court in *Floral Trade Council* concluded that the ITA's interpretation of the regulation allowing the use of the new "all other" rate as the cash deposit rate for unreviewed companies was not unreasonable. *Id.* at 656, 799 F. Supp. at 119; *Defendant's Brief* at 54–55.

Federal-Mogul argues that this Court should not follow *Floral Trade Council*, as the court in that case was "concerned that all relevant arguments may not have been made on this issue" and was "unprepared to conclude as a general proposition that ITA's new approach is consistent with its regulation." 16 CIT at 656 n.2, 799 F. Supp. at 119 n.2. Federal-Mogul argues that the court in *Floral Trade Council* decided the case solely on its specific facts. *Plaintiff's Brief* at 64–65 n.123.

This Court adheres to its decision on this issue in *Federal-Mogul Corp. v. United States*, 17 CIT 442, 822 F. Supp. 782 (1993), based on the rationale stated therein. The Court finds that the ITA's use of the new "all other" rate calculated during this administrative review as the new cash deposit rate for unreviewed companies which have previously received the "all other" rating is not in accordance with law. This case is remanded to the ITA with instructions to reinstate the "all other" cash deposit rate which applied to respondents prior to these Final Results, provided that their entries have not become subject to assessment pursuant to a subsequent administrative review.

### 6. *SKF-Germany's Home Market Commission Expenses:*

Federal-Mogul claims that, in performing the comparison of sales price with COP[7] for SKF-Germany, the ITA unlawfully failed to remove commission expenses which were not accounted for in COP from sales price before making the comparison. *Plaintiff's Brief* at 67–74. Consequently, plaintiff alleges that "some of the home market sales appeared to have been made at prices above COP when in fact they were made at prices below COP and should, therefore, have been disregarded in calculating FMV." *Id.* at 68–69. Plaintiff claims that commission expenses typically are incurred only on specific sales and are not allocated over all sales and included in COP. Rather, plaintiff claims, "Commerce associates expenses which are incurred in that fashion with the specific sales to which they pertain and removes them from sales price prior to the comparison with COP." *Id.* at 68 n.131.

The ITA states that, although Federal-Mogul has not identified specific instances where the alleged error occurred, it "does request a remand in order to investigate whether its COP comparison included any home market sales containing commissions." *Defendant's Brief* at 61. The ITA claims that if instances of the alleged error are found, it "will remove the commission expenses from the sales price before comparing it with COP." *Id.*

SKF contends that it included home market commissions in its COP calculations and, therefore, no deduction from sales price for commissions is necessary. *SKF's Brief* at 32–33.

The ITA must determine whether the home market sales price is a proper measure of foreign market value. Section 1677b(b) mandates that sales made at less than COP be omitted from the FMV calculation if they are made over an extended period of time and are made in substantial quantities at prices which do not permit cost recovery within a reasonable period in the normal course of trade. 19 U.S.C. § 1677b(b) (1988). Therefore, the Court remands this issue to the ITA to allow it to remove unaccounted for home market commission expenses from sales price before making the sales price to cost of production comparison for SKF-Germany so that the ITA may fairly evaluate whether any home market sales fall within the purview of 19 U.S.C. § 1677b(b) in the calculation of FMV.

### 7. *SKF-Italy's Home Market Credit Expenses:*

Federal-Mogul contests the ITA's downward COS adjustment to FMV for SKF-Italy's imputed cost related to the sale of merchandise on delayed payment terms. *Plaintiff's Brief* at 74–80. Plaintiff contends that the period between the payment due date and the date of actual payment was erroneously included in the adjustment. *Id.* at 76. Plaintiff claims that credit expenses which might arise due to a purchaser's failure to pay within the agreed-upon credit period could not have affected

---

[7] Cost of production is to be calculated "based on the cost of materials, fabrication, and general expenses, but excluding profit, incurred in producing such or similar merchandise." 19 C.F.R. §353.51(c) (1992).

the price which was set in contemplation of payment being made by the payment due date. *Id.* Plaintiff contends that the ITA is required to reject a COS adjustment on the basis of cost where evidence shows that cost does not affect value. *Id.* at 78.

The ITA objects to the Court's consideration of this issue on the grounds that Federal-Mogul has failed to exhaust administrative remedies. The ITA contends that, whereas Federal-Mogul argued during the administrative proceeding that credit expense should be reduced by the amount of interest revenue earned on SKF-Italy's late payments, it now argues that expenses related to late payments should not have been included in SKF-Italy's home market credit expenses in the first place. *Defendant's Brief* at 63. The ITA contends that plaintiff is precluded from raising this claim as it failed to raise it in the underlying proceeding. *Id.* at 61.

Federal-Mogul counters that, as the ITA was unwilling to lessen the credit expense for SKF-Italy, it would have been futile to have urged it to delete the expense rather than to reduce it. Relying on *American Alloys, Inc. v. United States,* 17 CIT 8, 810 F. Supp. 1294 (1993), *rev'd on other grounds,* No. 93–1539 (Fed. Cir. July 27, 1994), plaintiff claims that under these circumstances, the exhaustion rule does not apply. *Federal-Mogul Corporation's Reply to the Responses to Federal-Mogul Corporation's First Motion for Partial Judgment Upon the Agency Record ("Plaintiff's Reply")* at 24.

In the underlying proceeding, plaintiff in fact did not argue that credit expenses related to late payments should be deducted from SKF-Italy's credit expense adjustment, rather it argued that

> * * * RIV-SKF earns interest revenue on transactions where customers make late payments — i.e., for a portion of the shipment-to-payment period on certain transactions. RIV-SKF has additional sale-generated interest income (as well as imputed credit expense) during those late-payment portions of the nominal credit period. *RIV-SKF should have netted-out interest revenue* from price in calculating the credit expense * * *. *The Department should now* make that correction and *reduce the home market credit amounts* accordingly.

Italy AR (Pub.) Doc. 238 at 18 (emphasis added). The court has stated that a "litigant may not raise an issue for the first time on appeal." *See Cemex, S.A. v. United States,* 16 CIT 251, 258, 790 F. Supp. 290, 296 (1992), *aff'd,* 989 F.2d 1202 (Fed. Cir. 1993); *see also Sigma Corp. v. United States,* 17 CIT 1358, 1365, 841 F. Supp. 1275, 1281 (1993); *Wieland Werke, AG v. United States,* 13 CIT 561, 567, 718 F. Supp. 50, 55 (1989). By failing to raise this issue at the administrative level, Federal-Mogul has denied the ITA the opportunity to consider the merits of its claim at the appropriate time.

The court has recognized several exceptions to the exhaustion of administrative remedies requirement. *See Budd Co. Wheel & Brake Div. v. United States,* 15 CIT 446, 452–53, 773 F. Supp. 1549, 1554–55

(1991); *see also Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 134, 583 F. Supp. 607, 609 (1984). In this case, however, plaintiff has not convinced the Court to accept its futility argument. In *American Alloys,* plaintiffs had clearly introduced the contested issue in the underlying proceeding. Nonetheless, the court recognized that the ITA was adamant in its opposition to the court's interpretation of 19 U.S.C. § 1677a(d)(1)(C) as requiring a tax pass through measurement. The ITA's opposition to tax incidence measurement was made clear in the ITA's brief and its reliance on ten determinations in which the ITA had stated its well-established position that the statute did not require a tax pass through measurement. Recognizing the ITA's commitment to that position, that court found that arguing the pass through issue would have been futile. *American Alloys,* 17 CIT at 14–15, 810 F. Supp at 1299–300.

In contrast, Federal-Mogul has presented an issue to the Court that is distinct from that brought up in the underlying proceeding and has forced the ITA to belatedly express a position on this issue. In this case, it is not evident from the ITA's brief or the precedent on which it relies that the ITA's position is such that it would have been futile for Federal-Mogul to have raised this issue in the underlying proceeding. In Federal-Mogul's own words, the ITA was "able to locate a smattering of other determinations in which Commerce appears to have made the same adjustment as is challenged herein." *Plaintiff's Reply* at 25–26 n.57.

The Court finds that Federal-Mogul has neither established that it raised this issue in the underlying proceeding nor established an exception to the doctrine of exhaustion so as to permit the Court to entertain plaintiff's argument. The court "usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Wieland Werke,* 13 CIT at 567, 718 F. Supp. at 55; *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37 (1952). As plaintiff has not exhausted administrative remedies, plaintiff's motion fails with respect to this issue.

### 8. *FAG-Italy's Financial Expenses:*

Federal-Mogul claims that, in performing the COP to sales price comparison for FAG-Italy, the ITA unlawfully failed to correct an error in FAG-Italy's reported financial expenses. *Plaintiff's Brief* at 80. Federal-Mogul asserts that FAG-Italy generated erroneous financial expense data and, unable to correct its computer tape, it alerted the ITA to use a different percentage of the value FAG-Italy reported as "COMI" than that which FAG-Italy had used. *Id.* at 80–81. Plaintiff claims that the ITA did not correct the error because it concluded that the clerical error had no effect on the calculation of FAG-Italy's dumping margin. *Id.* at 81. Plaintiff contends that this error caused FAG-Italy's COP to be understated and was of sufficient magnitude as to make a difference in the comparison of sales price to COP. Specifically, plaintiff contends that

the error caused some of FAG-Italy's home market sales to appear to have been made at above COP prices when they were actually made at below COP and, therefore, should have been disregarded in the calculation of FMV. *Id.* at 80–84.

The ITA concedes that it inadvertently failed to make the correction to financial expenses which was suggested by FAG-Italy. *Defendant's Brief* at 68. Recognizing that this clerical error may impact on the COP calculation, the ITA "requests a remand on this issue so that the correction can be made to determine whether any other sales were made at prices below COP." *Id.* If upon making the correction, the ITA finds that other sales were made at below COP, the ITA states that it "will make the appropriate adjustment to the FMV calculation." *Id.* at 68–69.

Correction of this error would facilitate evaluation of whether home market sales price is a proper measure of foreign market value with respect to calculation of FMV pursuant to 19 U.S.C. § 1677b. Therefore, the Court remands this issue to the ITA to correct the error relating to "COMI" with respect to FAG-Italy's financial expenses. If upon making this correction, the ITA finds that other sales were made at below COP such that it is appropriate to adjust FMV, it is to make that adjustment.

### 9. *FAG-Italy's Related-Party Transfer Prices:*

The ITA used constructed value to determine FMV for numerous U.S. sales for FAG-Italy. Federal-Mogul claims that, for purposes of constructed value and COP analyses, FAG-Italy inaccurately reported costs for bearing parts obtained from its parent company. *Plaintiff's Brief* at 84–89. Specifically, plaintiff claims that FAG-Italy paid transfer prices for inputs from its related supplier but provided the ITA with COP data in lieu of these prices because the relationship of the transfer prices to market value and to actual production costs was unclear and no arm's length market existed for the inputs. Plaintiff contends that FAG-Italy erroneously excluded profit from its COP data. *Id.*

Relying on § 1677b(e)(2), Federal-Mogul argues that, where related-party transactions comprise a portion of the constructed value calculation but are disregarded because they are not at arm's length and no market exists by which the value of these transactions may be determined, the transfer prices should be adjusted according to the best evidence available to reflect arm's length prices. 19 U.S.C. § 1677b(e)(2) (1988); *Plaintiff's Brief* at 84. Plaintiff claims that profit would normally be included in arm's length transactions. *Id.* at 86. Plaintiff asserts that, for purposes of constructed value, the "special rule" of 19 U.S.C. §1677b(e)(3) permits the ITA to use the costs of producing inputs sourced from a related party to determine their value only where, based on best evidence, these costs exceed arm's length prices. 19 U.S.C. § 1677b(e)(3) (1988); *Plaintiff's Brief* at 84–85. Federal-Mogul urges that the ITA should adjust FAG-Italy's COP data to reflect profit so that the resulting amount "may reasonably be regarded as being more than

the value of the parts in unrelated party transactions." *Plaintiff's Reply* at 28.

Plaintiff alleges that, in accepting the unaltered COP data and ignoring the statute, the ITA has understated FAG-Italy's CVs. *Plaintiff's Brief* at 85. Moreover, plaintiff claims that the ITA "pursued the same flawed methodology in calculating FAG-Italy's COPS as well, notwithstanding the Act's manifest desire that merchandise in related-party transactions be valued as though the transactions were between unrelated parties." *Id.*

With respect to calculation of constructed value, the ITA argues that no market existed for arm's length transactions for the inputs at issue. *Defendant's Brief* at 70. Defendant asserts that, therefore, the cost of producing those parts is the "best evidence available" of their transaction price in accordance with § 1677b(e)(2). *Id.* at 71–72. In the Final Results, the ITA stated, "The record does not provide specific evidence that warrants rejecting using cost of production to value purchases from related parties. The company and its counsel certified that this information was accurate." *Final Results,* 57 Fed. Reg. at 28,416.

With respect to calculation of COP, the ITA maintains that no statutory authority requires it to calculate a hypothetical armslength transaction price for inputs purchased from related companies. *Defendant's Brief* at 70.

First, Federal-Mogul's reliance on the "special rule" of §1677b(e)(3) is misplaced. That section applies where the ITA has reasonable grounds to believe or suspect that the value attributed to inputs is less than the costs of producing those inputs. The ITA has accepted cost of production as the best evidence of the value of the inputs from FAG-Italy's related supplier. Federal-Mogul has pointed to no evidence which indicates that the ITA should believe or suspect that the amount represented as the value of these inputs is less than the costs of production of the inputs. Second, a modification of FAG-Italy's COP data for the purpose of assuring that the costs of production exceeds an unknown value in a nonexistent market could not be justified.

Nevertheless, in calculating constructed value, the ITA is obligated to allocate profit, as well as various costs and expenses to the products under investigation. *See* 19 U.S.C. § 1677b(e)(1) (1988). *See also* 19 C.F.R. § 353.50(a) (1992). Where determining a profit amount is problematical, the ITA is not without guidance. It may employ the statutory minimum of eight percent of the sum of general expenses and cost. 19 U.S.C. § 1677b(e)(1)(B)(ii) (1988).

Hence, as profit is a part of the constructed value calculation, the Court finds that the ITA erred in not adjusting FAG-Italy's COP data to include profit in its calculation of constructed value. In this respect, the constructed value calculation is not supported by substantial evidence on the record and is not in accordance with law. This case is remanded to the ITA with instructions to add an amount for profit which is not less

than the statutory eight percent minimum to FAG-Italy's COP data and to make any adjustments to constructed value that may be required as a result.

With regard to COP calculation, the Court agrees with the ITA that no statutory authority requires what plaintiff seeks. *See* 19 C.F.R. § 353.51(c) (1992). Hence, with respect to the calculation of FAG-Italy's COP, the ITA is sustained.

10. *FAG-Italy's Expenses Incurred in Germany:*

Federal-Mogul objects to the ITA's grant of a COS adjustment to FMV for FAG-Italy for expenses incurred by FAG-Italy's parent company. Plaintiff alleges that the ITA unlawfully reduced Italian antifriction bearing ("AFB") sales prices by an amount for indirect selling expenses incurred in Germany by FAG-Germany. Federal-Mogul argues that the ITA improperly allocated the FAG-Germany related expenses to FAG-Italy as FAG-Germany never handled FAG-Italy's AFBs. *Plaintiff's Brief* at 90. Plaintiff's principal argument is that the ratio employed by FAG-Italy to allocate indirect expenses to the Italian home market is identical to that employed to allocate similar expenses to the U.S. market, even though only the AFBs destined for the U.S. market were shipped to, warehoused, handled and processed in Germany. *Id.* at 90–92.

In the Final Results, FAG-Italy explained that certain costs related to its sales were incurred by its parent company in Germany. It asserted that FAG-Germany "maintains a worldwide marketing staff, whose costs constitute an indirect selling expense." *Final Results,* 57 Fed. Reg. at 28,411. FAG-Italy explains that FAG-Germany's staff manages sales and marketing efforts throughout the world on behalf of all FAG subsidiaries and the cost of this staff is allocated according to a single ratio for all FAG affiliates. *FAG's Brief* at 49–50. Further, FAG-Italy argues that indirect expenses incurred in Germany are not allocated identically to the Italian home market and the U.S. market as the U.S. market has additional indirect selling expenses which are specific to that market. *Id.* at 50–51.

In the Final Results, the ITA stated, "[W]e verified FAG-Germany's home market indirect selling expenses and determined that the allocation methodology reasonably captured indirect selling expenses incurred on sales of the subject Italian merchandise." *Final Results,* 57 Fed. Reg. at 28,411. The ITA argues that the major components of the Germany-incurred indirect expenses had no direct connection to the handling of merchandise in Germany. Germany AR (Conf.) Doc. 34 at Frame 2319; *Defendant's Brief* at 73.

Federal-Mogul fails to point to any evidence on the record which shows the precise nature of the Germany-incurred expenses and therefore its assertion that U.S. sales must bear a greater proportion of these costs is mere conjecture. The ITA is given discretion in its choice of methodology as long as the chosen methodology is reasonable and the

ITA's conclusions are supported by substantial evidence in the record. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed. Cir. 1987). The administrative record supports the ITA's conclusion regarding the expenses at issue. Hence, the ITA's determination that the indirect expenses relative to FAG-Germany are allocable to FAG-Italy is supported by the record and is in accordance with law.

### 11. *FAG-Italy's Technical Services and Warranty Expenses:*

In calculating FMV, the ITA granted FAG-Italy a direct adjustment to home market price for differences in circumstances of sale pursuant to § 353.56(a)(1) for technical services and warranty expenses. 19 C.F.R. § 353.56(a)(1) (1992). Federal-Mogul challenges this adjustment arguing that FAG-Italy's allocation for expenses and sales includes products not within the scope of these reviews. *Plaintiff's Brief* at 96–98. Specifically, plaintiff asserts that FAG-Italy's claimed "home-market technical-services and warranty expenses consisted of expenses incurred for sales of all product in Italy allocated over sales of all product in Italy." *Id.* at 96. Plaintiff alleges that FAG-Italy allocated technical services and warranty expenses: (1) whether incurred for AFBs or for other products; (2) whether incurred on products produced by FAG-Italy or another company; and (3) whether incurred on products produced in Italy or another country—over those sales. *Id.* at 98. Plaintiff claims that there is no evidence on what portion of FAG Italy's reported expenses, if any, relates to Italian sales of AFBs produced by FAG-Italy. *Id.* at 99. Plaintiff contends that selling expenses which cannot be identified to any particular products and which are, therefore, allocable over all sales are considered indirect expenses. *Id.* at 96–101. For support, plaintiff relies on *LMI-La Metalli Industriale, S.p.A. v. United States,* 13 CIT 305, 312, 712 F. Supp. 959, 965 (1989), *aff'd in part and rev'd in part on other grounds,* 912 F.2d 455 (Fed. Cir. 1990), and *Industrial Quimica del Nalon, S.A. v. United States,* 15 CIT 240 (1991). *Id.* at 100–101.

The ITA asserts that Federal-Mogul's allegations are mere conjecture. *Defendant's Brief* at 76. Moreover, the ITA argues that it has previously allowed an allocation of variable expenses which did not distinguish between in-scope and out-of-scope products where it deemed the allocation reasonable. *Id.* at 76–77. The ITA notes that "FAG-Italy explained that it could not segregate expenses related only to the sale of scope products." *Id.* at 78. The ITA argues that "any non-scope products included in [FAG Italy's] bearings expense factor were similar bearings expenses." *Id.* Defendant further argues that since expenses incurred on out-of-scope products are likely to be similar to expenses incurred on in-scope bearings, it is unlikely that there is a distortion in the per unit expense cost for FAG-Italy's scope bearings. *Id.* at 76–77. The ITA contends that there is no reason to believe that there was more servicing or sales of out-of-scope products than for bearings.

*Id.* at 79. Defendant claims that allocations must reasonably reflect expenses for products covered by the scope of review and that it "properly found FAG-Italy's technical services and warranty expense allocation to be reasonable." *Id.* at 77.

FAG-Italy asserts that its allocation included variable technical services personnel travel expenses and expenses related to issuance of credit notes for defective products, but that expenses not related to specific sales fell into other accounts and were not included in the expense allocation numerator pool. *FAG'S Brief* at 51.

In the analogous context of rebates and discounts, the Court has repeatedly held that "in order for a discount or rebate to qualify as a direct cost to be subtracted from FMV, the discount or rebate must have been actually paid on all of the sales under consideration and allocated on the basis of actual cost and sales figures." *See Koyo Seiko Co. v. United States,* 17 CIT 975, 978, Slip Op. 93–176 at 7 (Sept. 9, 1993); *see also Smith-Corona Group,* 713 F.2d at 1580. Adjustments involving technical services and warranties would be similarly limited.

This court has affirmed an indirect relationship classification with respect to technical service expenses where the respondent produced numerous products and failed to allocate the technical services personnel costs to the product under consideration. *LMI-La Metalli,* 13 CIT at 312, 712 F. Supp. at 965. Where the respondent produced only the product which was under consideration, the court reversed the ITA's refusal to treat technical services as direct selling expenses and distinguished the *LMI-La Metalli* decision, stating:

> *L.M.I.'s* direct relation rule sprang primarily from the need in that case to differentiate between the various products produced and the products under investigation. The *L.M.I.* technicians serviced several products, not just the products under investigation, and Commerce could not apportion the costs between the different products based on the information provided by *L.M.I.*

*Industrial Quimica del Nalon,* 15 CIT at 242 (citations omitted).

Nonetheless, in the analogous context of rebates, the CAFC has approved an apportionment of total rebates paid between in-scope and out-of-scope sales where that apportionment yielded the actual amount per unit paid on sales of in-scope merchandise. *Smith-Corona,* 713 F.2d at 1580. That apportionment was possible because the rebates in *Smith-Corona* were granted as a fixed percentage of sales, regardless of the models sold. *Id.* This Court has consistently adhered to this standard when considering apportionment methodologies. *See, e.g., Torrington Co. v. United States,* 17 CIT 1329, 1333–35, 850 F. Supp. 1, 4–5 (1993), *appeal docketed,* No. 94–1188 (Fed. Cir. Feb. 8, 1994); *Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F. Supp. 1526, 1529–30 (1992). The question arises whether FAG-Italy's allocation methodology for technical services and warranty expenses can be reconciled with the methodology approved by the court with respect to rebates in *Smith-Corona,* 713 F.2d at 1579–81. Therefore, the Court remands this issue to

the ITA to determine whether FAG-Italy's technical services and warranty expenses meet this standard so as to justify their classification as direct expenses.

Also, in the analogous context of discounts and rebates, where a home market discount or a rebate has not been directly correlated with specific in-scope merchandise on the basis of actual costs, this Court has consistently upheld the ITA's adverse assumption regarding the expenses. *Federal-Mogul Corp. v. United States*, 17 CIT 1093, 1102–03, 834 F. Supp. 1391, 1399–400 (1993); *Torrington Co.*, 17 CIT at 1335, 850 Fed. Supp. at 5; *NSK Ltd. v. United States*, 17 CIT 1185, 1187–88, 837 F. Supp. 437, 439 (1993). The Court directs the ITA to treat technical services and warranty expenses similarly if they do not qualify as direct expenses.

This Court emphasizes, however, that the rebates on out-of-scope merchandise in *Smith-Corona* were not included in the final calculation of the customer-specific post sale price adjustments and rebates used in calculating actual dumping margins. The methodology approved in *Smith-Corona* involved "comput[ing] the ratio of the total sales amount of [in-scope merchandise] to the total sales amount of all merchandise subject to the rebate program. This ratio, multiplied by the total amount of rebate paid, yields the total amount of rebate paid for [in-scope merchandise] sales." *Smith-Corona*, 713 F.2d at 1579–80. In the case at bar, it is not clear whether technical services and warranty expenses incurred on FAG-Italy's sales of out-of-scope merchandise were used in the calculation of the adjustment to FMV for FAG-Italy's home market sales technical services and warranty expenses. It is clear, however, that no effort was made to segregate the expenses incurred on in-scope merchandise. Merchandise which is outside the scope of an antidumping duty order cannot be used in the calculation of antidumping duties. 19 U.S.C. § 1675(a)(2) (1988); *see Torrington Co. v. United States*, 17 CIT 199, 208–09, 818 F. Supp. 1563, 1578 (1993).

While the ITA has much discretion in developing and accepting techniques which facilitate calculations, the Court cannot allow the ITA to use a methodology which allows for the inclusion of technical services and warranty expenses on out-of-scope merchandise in calculating adjustments to FMV and ultimately the dumping margins. Therefore, upon remand, if technical services and warranty expenses incurred on out-of-scope merchandise are included in any adjustment to FMV for FAG-Italy, the ITA is directed to develop a methodology which removes technical services and warranty expenses incurred on sales of out-of-scope merchandise from any adjustments made to FMV for these expenses. If no viable method can be developed for their removal, the ITA is to deny an adjustment for technical services and warranty expenses in its calculation of FMV for FAG-Italy.

12. *SNR's Home Market Packing Costs:*

Federal-Mogul next argues that the ITA incorrectly calculated FMV for SNR when it removed packing costs from its home market price. Plaintiff contends that SNR's home market sales are made under terms and conditions which exclude packing unless a contrary agreement is made. *Plaintiff's Brief* at 101–03. Plaintiff contends that, nevertheless, SNR allocated its various total packing costs equally over all home market sales and in accepting this allocation and removing packing costs from SNR's home market prices, the ITA unlawfully understated FMV for SNR and, ultimately, its dumping margin. *Id.*

In the Final Results, the ITA noted, "We verified SNR-France's packing material and labor expenses and are satisfied that the company allocated this expense only across relevant transactions." *Final Results,* 57 Fed. Reg. at 28,397. The ITA asserts that it reviewed SNR's claims of home market packing costs exhaustively during verification. *Defendant's Brief* at 82–83. Defendant contends that it verified the accuracy of SNR's claimed home market packing costs and its method of allocation for packing material and labor. *Id.* at 83–84. The ITA asserts that, in spite of boilerplate language in SNR's standard contract indicating that home market prices are exclusive of packing unless per contrary agreement, SNR's actual business records demonstrated that home market packing costs were included in its reported home market prices. *Id.* at 80–85.

SNR claims that it provided the ITA with a specific sales agreement between itself and its largest customer in the home market showing that prices included packing. *Non-Confidential Memorandum of Defendant-Intervenor SNR Roulements ("SNR") in Opposition to Plaintiff's First Motion for Partial Judgment Upon the Agency Record ("SNR's Brief")* at 34.

In calculating foreign market value, § 1677b(a)(1) directs the ITA to increase price by the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States. 19 U.S.C. § 1677b(a)(1) (1988). To implement this directive, where home market prices include the costs of packing, the ITA removes these costs from home market price and adds to home market price the costs of packing the merchandise for exportation to the United States. 19 C.F.R. § 353.41(d)(i) (1992). The ITA followed this procedure with respect to SNR.

The record shows that the ITA fully verified that SNR's home market prices included packing costs, therefore, a deduction from FMV for these costs was warranted. "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co.,* 12 CIT at 962, 699 F. Supp. at 306. Therefore, the Court sustains the ITA's treatment of SNR's home market packing expenses.

13. *SKF-Italy's Warehouse Expenses:*

Federal-Mogul next argues that the ITA calculated USP incorrectly for SKF-Italy in that it erroneously classified SKF Italy's U.S. bonded warehouse costs as warehouse costs rather than as movement expenses incurred on purchase price sales. *Plaintiff's Brief* at 104–10. Plaintiff claims that the ITA's reliance on past practice to treat pre-sale warehousing expenses as indirectly related to sales ignored "the specific facts at hand which established that the U.S. bonded-warehouse costs were incurred by SKF-Italy exclusively for the purpose of making sales to one PP customer." *Id.* at 104. Plaintiff maintains that SKF-Italy's warehoused merchandise was identified exclusively to a particular customer from the moment it was exported from Italy. *Id.* at 106.

Federal-Mogul takes issue with the ITA's practice of automatically treating pre-sale warehouse costs as indirect selling expenses, claiming that this practice is inappropriately inflexible insofar as it has not been formally adopted as a rule. *Id.* at 107. Additionally, plaintiff argues that the ITA must at least explain why the pre-sale costs at issue are not selling expenses directly related to SKF-Italy's purchase price sales. *Id.* at 108.

For comparison to ESP sales, the ITA made a deduction from foreign market value for indirect selling expenses comprised of warehousing costs in order to account for differences in warehousing expenses incurred in the two markets. This amount was capped by the amount of the indirect selling expenses incurred on sales in the United States, in accordance with the ITA's regulation, 19 C.F.R. § 353.56(b)(2) (1992). *Defendant's Brief* at 86.

The ITA argues that, except in the narrow exception related to post-sale warehousing costs incurred specifically for the purpose of moving merchandise to the place of delivery in the United States, it has rejected treating warehousing expenses as movement expenses. *Id.* at 87. Defendant states that it is undisputed that SKF-Italy's warehousing expenses were pre-sale expenses, thus it reasonably refused to treat them as movement expenses. *Id.* at 88.

Defendant argues that its decision is an "interpretive rule" in that "it interprets the term 'movement expenses' to mean expenses incurred in the process of moving particular goods to a particular buyer pursuant to a particular order" and, therefore, its "refusal to treat pre-sale warehousing expenses as movement expenses constitutes a reasonable interpretation of the applicable statute and regulation rather than an arbitrary rule." *Id.* at 89.

Additionally, defendant protests that Federal-Mogul did not argue, in the underlying proceeding, that SKF-Italy's warehousing expenses should be treated as direct expenses if they were deemed selling expenses and, therefore, Federal-Mogul is precluded from raising this claim for the first time before the Court. *Id.* at 89–90. However, defendant requests that the Court remand this issue to the ITA for further

consideration if it finds that Federal-Mogul's claim falls within the exception to the exhaustion of remedies requirement. *Id.* at 90.

SKF-Italy states that, since the date of sale for its purchase price sales is the date of invoice and shipment out of its warehouse to its purchase price customer's foreign trade zone, its warehouse expenses were pre-sale expenses. *SKF's Brief* at 37. SKF argues that these expenses were properly classified as indirect selling expenses and therefore warranted no deduction from U.S. price. *Id.* at 38.

When calculating U.S. price, the ITA is required to reduce the U.S. price by any expenses "*incident to bringing* the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." 19 U.S.C. §1677a(d)(2)(A) (1988) (emphasis added). As an initial matter, the Court must decide whether, in determining that SKF-Italy's warehouse expenses were not movement expenses, the ITA applied a permissible construction to the statute.

In a well-reasoned opinion, this court addressed statutory construction with respect to this issue. *Nihon Cement Co. v. United States,* 17 CIT 400, Slip Op. 93–80 (May 25, 1993). In *Nihon Cement,* the court acknowledged that movement expenses are broadly interpreted and are not confined to freight expenses. Amounts attributable to shipment to the U.S. customer can include, "among other possible charges, foreign inland freight and insurance; foreign brokerage, handling and port charges; international freight (ocean, air, land) and insurance; U.S. Customs duties; U.S. brokerage, handling and port charges and U.S. inland freight and insurance. The foreign market price is similarly reduced by delivery costs * * *." *Id.* at 420, Slip op 93–80 at 39. Thus, the fact that SKF-Italy's warehouse expenses were not freight expenses does not preclude them from being movement expenses.

In *Nihon Cement,* the court evaluated the factors which distinguish movement from warehouse expenses, concluding that

> the subject expenses must be classified as warehousing expenses if the [facilities] actually were being used to put aside [the merchandise] for use when needed. If, on the other hand, the [merchandise] was merely residing in the [facilities] "incident to bringing" the [merchandise] from one location to another, the expenses must be considered as movement expenses.

*Id.* at 421, Slip Op. 93–80 at 40; *see* 19 U.S.C. § 1677a(d)(2)(A).

It is clear from *Nihon Cement* that the ITA's classification of warehouse expenses must be based on a substantive analysis of all the factors suggesting their true nature.

> Factors indicating the actual use of the facility in the present case, such as the type of facility, whether the facility was movable, i.e. had wheels, was a ship, the process the merchandise was undergoing, the length of time involved, as well as other factors must be taken into account.

*Nihon Cement,* 17 CIT at 421, Slip Op. 93–80 at 41.

In the instant case, the ITA limited its discretion to consideration of form over substance. In interpreting the concept of movement expense, the ITA focused narrowly on factors such as movement and post-sale status without considering other relevant factors. Information on the administrative record indicates that SKF-Italy's U.S. warehouse might in reality have functioned as a transfer point, facilitating delivery to one specific customer. Italy AR (Conf.) Doc. 16 at 88. If the merchandise at issue was residing in SKF-Italy's U.S. facility incident to bringing the merchandise from one location to another rather than merely put aside for use when needed, the expense incurred relative to that facility would be a movement expense. The Court is not able to discern from the record the length of time that the subject merchandise resided in SKF-Italy's U.S. facility. That information would be important in ascertaining whether inventory was maintained at a level which met the actual level of demand of SKF-Italy's U.S. customer such that merchandise was moved through the warehouse on a continuous basis and not stored awaiting sale to the end user. An additional consideration would be that the merchandise was not available to meet general inventory needs and sales commitments.

Therefore, the Court finds the ITA's determination that SKF Italy's U.S. warehouse expenses relating to purchase price sales were not movement expenses was not a permissible construction of the statute and was not in accordance with law. The Court remands this issue to the ITA with instructions to determine whether SKF Italy's U.S. bonded warehouse functioned as a warehouse or as a transport facility. In its analysis, the ITA is directed to evaluate why the subject merchandise resided in the warehouse based on all relevant factors. Having remanded on the basis of plaintiff's first argument, the Court does not reach the parties' other arguments.

14. *SKF-Italy's Duty Drawback Adjustment:*

Relying on an excerpt from the Italian law on duty drawback, Federal-Mogul also alleges that the duty drawback refund SKF-Italy received by reason of exportation reflected import duty and indirect taxes imposed both directly and indirectly upon the exported merchandise. Plaintiff contends that § 1677a(d)(1)(C) allows adjustments only for forgiven taxes imposed directly upon merchandise. 19 U.S.C. § 1677a(d)(1)(C) (1988); *Plaintiff's Brief* at 110–14. Federal-Mogul further alleges that SKF-Italy did not demonstrate that it imported sufficient amounts of steel to warrant the amount of duty drawback it claimed. *Id.*

The ITA argues that SKF-Italy (1) demonstrated that it received a duty drawback refund on exports; (2) provided the duty drawback rate applicable for bearings; and (3) submitted the Italian duty drawback law showing that the Italian government makes payment of import duties a prerequisite to eligibility for a duty drawback refund. *Defendant's Brief* at 92.

The rebate or refund of import duties upon exportation of merchandise is known as a duty drawback. *See, e.g.,* 19 U.S.C. §1313(a) (1988). The antidumping statute allows an upward adjustment to United States price, often referred to as a duty drawback adjustment. *See* 19 U.S.C. § 1677a(d)(1)(B) (1988). The ITA must increase USP by the amount of duties that were rebated or not collected as a result of exportation of merchandise.

The ITA applies a two-prong test to determine entitlement to a duty drawback adjustment pursuant to 19 U.S.C. § 1677a(d)(1)(B). This test requires: (1) that the import duty and rebate be directly linked to, and dependent upon, one another, and (2) that the party claiming an adjustment demonstrate sufficient imports of the raw material to account for the duty drawback received on the exports of the manufactured product. U.S. Int'l Trade Admin., U.S. Dep't of Commerce, *Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change* 26 (1985). The court has consistently upheld the ITA's two-prong test. *See Far East Mach. Co. v. United States,* 12 CIT 972, 979, 699 F. Supp. 309, 315 (1988) *("Far East Mach. II"); Far East Mach. Co. v. United States,* 12 CIT 428, 431, 688 F. Supp. 610, 612 (1988) *("Far East Mach. I"); Carlisle Tire & Rubber Co. v. United States,* 11 CIT 168, 171–73, 657 F. Supp. 1287, 1290–91 (1987). The ITA must limit duty rebate adjustments to the amount of duties actually paid. *Far East Mach.* II, 12 CIT at 974–75, 699 F. Supp at 312.

The first prong of the test requires the ITA to determine whether the foreign country makes entitlement to rebates dependent upon payment of import duties. *Id.* at 974, 699 F. Supp. at 311; *Far East Mach. I,* 12 CIT at 431, 688 F. Supp. at 612 (citation omitted). Here, the ITA confirmed that the Italian rebate system makes payment of import duties a prerequisite to rebates. However, Federal-Mogul has alleged that the rebate SKF-Italy received from its government included import duty and indirect taxes imposed directly and indirectly on SKF-Italy's exports. The Court has read the text of the Italian duty drawback law and is of the opinion that this legislation provides the circumstances under which import duties and indirect taxes will be refunded. Federal-Mogul has offered no conclusive evidence to the contrary. Neither the Italian law nor the applicable rebate rate supports plaintiff's allegation that respondent's rebate included indirect taxes. Italy AR (Conf.) Doc. 16 at Frame 532; Italy AR (Pub.) Doc. 16 at 39. As the ITA reasonably found that SKF-Italy's import duty and rebate are directly linked to, and dependent upon, one another, the Court concludes that SKF-Italy's duty drawback adjustment meets the first prong of the test.

The second prong requires the foreign producer to demonstrate that it has imported a sufficient amount of raw materials to account for the rebate received upon export of the finished product. *Far East Mach. II,* 12 CIT at 974, 699 F. Supp. at 311–12. The Court has not been able to discern where in the administrative record it is shown that SKF-Italy imported sufficient amounts of raw materials upon which it paid import

duties to account for the rebate received on exports. Since both prongs of the test must be met, this Court remands this issue to the ITA to explain how it concluded that SKF-Italy satisfied both prongs of this test so as to warrant a duty drawback adjustment to USP. If the ITA cannot do so, the ITA is to recalculate USP for SKF-Italy without an adjustment for duty drawback.

### 15. *Meter's Credit Expense:*

With respect to Meter's credit expense, the ITA stated: "It is our practice to calculate direct credit expenses from date of shipment to date of payment. Meter has provided sufficient information regarding the calculation of credit expense. Therefore, we have found no reason to adjust Meter's reported credit expense. *Final Results,* 57 Fed. Reg. at 28,406.

Federal-Mogul takes issue with the ITA's calculation of USP with respect to Meter, alleging that Meter's credit expense period should have included the period between the date Meter completed production on its merchandise and the date the merchandise was shipped. *Plaintiff's Brief* at 114–17. Plaintiff contends that, as Meter's merchandise is custom-made and is sold before it is produced, that merchandise is identified to a particular sale as soon as it is made. Plaintiff further contends that, as Meter maintains no inventory, the expense at issue cannot be an inventory expense but must be a credit expense. *Id.* at 115–17. Plaintiff asserts that if the cost of not receiving payment upon completion of production of goods already sold is not a credit expense, it is a post-sale warehousing cost which would also have to be removed from USP. *Id.* at 117.

Plaintiff estimates that, after production, Meter experienced a one day delay in invoicing and as many as four days delay in shipment. Plaintiff wants the ITA to adjust Meter's reported credit expense calculation on sales by adding a minimum of five days for each U.S. sale. *Id.* at 114–17.

The ITA explains that, in this case, it made a circumstance of sale adjustment for differences in credit expenses incurred with respect to sales in the United States and the foreign market pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988). *Defendant's Brief* at 95. One of the expenses for which the ITA adjusted was the credit expense Meter incurred during the period between the date its merchandise was shipped to a customer and the date it received payment for that merchandise. *Id.* The ITA states that it classified this expense as a direct selling expense and fully deducted it from USP. Defendant classified the expense Meter incurred between the date of production and the date of shipment as an inventory carrying cost. *Id.* at 97.

Defendant contends that inventory carrying costs are indirect selling expenses and are not deductible from USP. Defendant argues that such costs are not incurred directly for the benefit of the customer. *Id.* at 97–98. Defendant also argues that inventory costs are incurred regardless of whether merchandise is sold or when payment is received,

whereas credit expenses are incurred only if payment is received after shipment. *Id.*

Nevertheless, the ITA requests that, if the Court determines that Meter's credit expenses should be measured from the date of production, the Court remand this issue to allow it to collect information concerning the length of time that elapsed between Meter's date of production and its date of shipment with respect to each home market sale. *Id.* at 99. The ITA asserts that it "did not request" this information from Meter on a sale specific basis. Defendant contends that an automatic addition of five days to Meter's credit expense period, simply because Meter reported that the time elapsing between production and shipment ranged from two to five days, would be an unlawful adverse application of the best information rule. *Id.* at 99–100.

The Court finds nothing wrong with the ITA's chosen method of measuring Meter's credit expenses. *Consolidated Int'l Automotive, Inc. v. United States,* 16 CIT 1062, 1066, 809 F. Supp. 125, 130 (1992). In the Court's view, it was reasonable to deem expenses arising after completion of production and before shipment as an inventory expense, even under the circumstances of this case. Meter explained that:

> The date of sale for most U.S. sales is the date of the client's purchase order. The subject merchandise sold by Meter is custommade. Meter and its customers meet to discuss the price, the customers' technical requirements, quantity requirements, *and desired delivery date* prior to the issuance of a purchase order. Upon agreement on all of these terms, the purchase order is issued.

Italy AR (Pub.) Doc. 84 at 4 (emphasis added). It is logical that, after production, the process of making merchandise available to a customer would take a certain amount of time. Such preparation may conceivably take the form of packaging, drawing up invoices, and possibly other tasks. In the Court's view, the date that merchandise would be available, after such tasks are completed, would be the date that the merchandise is shipped or is available for pick up. The period during which merchandise is unavailable to the customer, therefore, could not properly be deemed a period during which credit is extended pending payment. Hence, the Court affirms the ITA's treatment of Meter's credit expense.

16. *Freight Expenses for FAG-Italy, FAG-UK and FAG-Germany:*

Lastly, Federal-Mogul complains that the ITA should disallow an upward adjustment to USP for reimbursement of freight prepaid on certain ESP sales for FAG-Italy, FAG-UK and FAG-Germany as the amounts these respondents reported for freight reimbursed ("OTHER-EVE") exceeded the amount reported for prepaid freight ("INLFWCE") on shipments to unrelated U.S. customers. The ITA deducted from USP the costs reported as INLFWCE and added to USP the revenue reported as OTHEREVE. *Plaintiff's Brief* at 118–22. Plaintiff contends that "the freight cost removed from USP may be far less than the freight reimbursement added to USP, which effectively grants [respondents] a sub-

stantial artificial increase in USP that masks dumping margins." *Id.* at 118–19. Federal-Mogul urges the Court to instruct the ITA "to disregard the variable OTHEREVE in [respondents') U.S.-sales data base." *Id.* at 121–22.

The ITA explains that the differing amounts for INLFWCE and OTHEREVE cannot be reconciled because the amount reported as OTHEREVE for any single sale "is *not* a reimbursement of the amount reported as INLFWCE for that specific sale." This is because, as verified by the ITA, "freight charges [INFLWCE] are allocated over all sales, whereas reimbursements [OTHEREVE] are reported in connection with the specific sale to which they relate." *Defendant's Brief* at 101–05.

> In the Final Results, the ITA stated that it determined that FAG's allocation of freight charges is reasonable and complete. Simply because the majority of FAG's U.S. freight expenses are allocated does not preclude a respondent from reporting other revenue received upon reimbursement from an unrelated customer on an actual basis. Whenever possible, the Department's preference remains sales-specific reporting of this expense.

*Final Results,* 57 Fed. Reg. at 28,399–400.

FAG maintains that it reported both INLFWCE and OTHEREVE on a transaction-specific basis. *FAG's Brief* at 59. It claims that the disparity between the amounts results because the amounts paid out were either not collected at all, only partially collected, or collected at a profit to FAG. *Id.*

Federal-Mogul has pointed to no evidence on the administrative record which shows that the methodology employed by the ITA masks dumping. The ITA's treatment of FAG's freight expense is reasonable. The ITA is given discretion in its choice of methodology as long as the chosen methodology is reasonable and the ITA's conclusions are supported by substantial evidence in the record. *Ceramica Regiomontana,* 10 CIT at 404, 636 F. Supp. at 966. Accordingly, the ITA's treatment of freight expense for FAG-Italy, FAG-UK and FAG-Germany is sustained.

CONCLUSION

In accordance with the foregoing opinion, this case is remanded to the ITA: to examine the administrative record to determine the exact monetary amount of VAT paid on each sale in the home market and to assure that the amount added to the comparable USP sale pursuant to 19 U.S.C. § 1677a(d)(1)(C) is less than or equal to this amount; to add the full amount of VAT paid in the home market to FMV without adjustment; to treat currency hedging expenses as indirect selling expenses pursuant to 19 C.F.R. §353.56(b)(2); to reinstate the "all other" cash deposit rate applicable prior to these final results for entries which have not become subject to assessment pursuant to a subsequent administrative review; to remove unaccounted for home market commission expenses from sales price before making the sales price to cost of production comparison in the calculation of FMV for SKF-Germany; to correct

the clerical error relating to percentage of the value reported as "COMI" with respect to FAG-Italy's financial expenses and to adjust FMV for FAG-Italy if this correction indicates that such an adjustment is appropriate; to add an amount for profit no lower than eight percent to the COP data which was submitted in lieu of related-party transfer prices for FAG-Italy with respect to calculation of constructed value; to determine whether FAG-Italy's technical services and warranty expenses meet the standard required for those expenses to be treated as direct expenses and subtracted from FMV in accordance with this opinion; to develop a methodology which removes technical services and warranty expenses incurred on sales of out-of-scope merchandise from any adjustments made to FMV for FAG-Italy's technical services and warranty expenses. If no viable method can be developed, the ITA is to deny such adjustment in its calculation of FMV. The ITA is also to determine whether SKF-Italy's U.S. bonded warehouse functioned as a warehouse or as a transport facility and to adjust USP if it finds that this expense was incurred incident to bringing SKF-Italy's merchandise to the place of delivery in the United States; and to explain how it concluded that SKF-Italy had sufficient imports of raw materials to warrant a duty drawback adjustment to USP or, if it is unable to do so, to recalculate USP for SKF-Italy without an adjustment for duty drawback.

The ITA's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Rebuttal comments are due within fifteen (15) days of the date responses or comments are due.